Leonard and Elizabeth Zwyns v. Commissioner. Leonard Zwyns v. Commissioner.
Zwyns v. Commissioner
Docket Nos. 34448, 34449.
United States Tax Court
1954 Tax Ct. Memo LEXIS 333; 13 T.C.M. (CCH) 5; T.C.M. (RIA) 54019; January 11, 1954
*333 1. The taxpayer bought fish in Canada for sale in the United States. He deposited proceeds in United States banks and made transfers to Canadian banks by check or in cash. His records were inadequate to show income. Held, deficiencies determined from income as reconstructed from records of suppliers and customers are sustained. 2. The taxpayer contends understatement of income in returns was due to ignorance and not to fraud. Held, fraud not proved as to returns for 1941 and 1942, but returns for 1943, 1944, 1945, and 1946 were false and fraudulent with intent to evade tax. A. R. Kehoe, Esq., for the petitioners. John O. Durkan, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined the following deficiencies and 50 per cent additions *334 to the tax for fraud: Year
Deficiency
50% addition
1941
$ 1,340.18
$ 670.09
1942
474.24
237.12
1943
14,351.98
7,175.99
1944
4,083.98
2,041.99
1945
6,120.80
3,060.40
1946
6,749.85
3,374.98
$33,121.03
$16,560.57
The respondent also determined an addition to the tax for 1946 of $1,079.98 for failure to file a declaration of estimate or for substantial underestimate of tax. The taxpayers filed returns with the collector of internal revenue at Tacoma, Washington. Findings of Fact Leonard and Elizabeth Zwyns, husband and wife, are residents of Lynden, Washington, and have been such residents since about 1925. Leonard Zwyns was born in the Netherlands about 1891. He left school at the age of 10 to work in a slaughterhouse and in the field. In 1908 he came to the United States. He resided on a farm in Iowa where he bought, sold and trained horses. In 1913 he married. Later he moved to Sacramento, California, where he worked as a carpenter and was later employed in an ice plant. In 1925 the Zwynses moved to Lynden, which is about 5 miles from the Canadian border. Leonard engaged in operating a livestock farm. He became a citizen of the United *335 States in 1926 or 1927. In 1934 he worked for the Neptune Fish Products Corporation of Seattle, as a buyer of fish eggs in Canada for use as sports bait. About 1936 or 1937 he began to buy salmon in Canada to sell in the United States. He also hauled salmon for Japanese fishermen from Canada for delivery in the United States. In 1941 or 1942 the Japanese were interned and Zwyns bought and sold salmon entirely for his own account, buying in Canada and selling in the United States. He transported the fish by truck from Vancouver or other places in British Columbia to Seattle, Everett, or other cities in Washington. In some instances he sold fish in California. Zwyns' accounts and records were kept until 1945 by a bookkeeper who was also a fisherman. This bookkeeper disappeared in 1945 and took Zwyns' books. Zwyns engaged other bookkeepers without satisfactory results and attempted to keep his own records, which were inadequate as a means of determining his income. He maintained bank accounts at the First National Bank of Everett at Everett and the First National Bank of Ferndale at Ferndale, Washington, and at the Royal Bank of Canada at Steveston and New Westminster, Canada. Proceeds *336 of fish sold in the United States were deposited in the bank at Everett or Ferndale and funds were transferred to the Canadian bank for use in buying fish. The bulk of Zwyns' transactions were handled by check. Sometimes cash was drawn from the United States banks for use in buying fish or for deposit of United States dollars in the Canadian banks. The petitioners filed joint Federal income tax returns for the calendar years 1941, 1942, 1943, 1945, and 1946. They filed separate returns for 1944 on the community property basis. The returns for 1941, 1942, and 1943 were prepared by R. Schutte, a real estate agent in Lynden, from adding machine tapes prepared and furnished by Zwyns and his bookkeeper. The returns for 1944, 1945, and 1946 were prepared by R. A. Lehn, a certified public accountant, of Bellingham, Washington, or his associate, from adding machine tapes prepared and furnished by Zwyns. An amended return for 1946 prepared by Lehn was filed in February 1949, upon which a net operating loss deduction from 1948 was claimed. The taxpayers sustained a net operating loss for 1948 in the amount of $13,710.75 which may be carried back to 1946. The returns for 1941, 1942, and 1943 *337 disclosed the following: 1941
1942
1943
Total Receipts
$47,560.20
$54,593.10
$163,775.12
Cost of Goods Sold
Inventory at beginning of year
Nil
Nil
Nil
Merchandise bought for sale
$42,455.38
$45,000.00
$141,207.95
Labor
67.60
1,480.00
3,699.00
Materials and supplies
900.07
Other Costs
Total
$42,522.98
$46,480.00
$145,807.02
Less inventory at end of year
Nil
Nil
Nil
Net cost of goods sold
$42,522.98
$46,480.00
$145,807.02
Gross Profit
$ 5,037.22
$ 8,113.10
$ 17,968.10
Other Business Deductions
Salaries and wages not included as labor
$ $ $ Interest on business indebtedness
47.50
58.25
11.67
Taxes (State and Federal excise and property
taxes)
637.19
506.23
1,358.63
Depreciation
1,268.75
1,268.75
Cold storage charges
1,013.42
611.56
436.61
Gasoline and oil
1,254.08
908.58
1,017.69
Truck repairs, parts and other expense
359.77
116.01
1,003.00
Insurance on trucks
288.50
478.16
Insurance on garage
50.60
Truck licenses
454.50
Telephone bills
87.55
84.02
101.29
U.S. Customs import duty (and brokerage
for 1946)
3,817.60
2,076.88
8,775.26
Lumber and repairs
17.40
Bridge tolls
75.00
Border brokerage charges
141.50
297.00
Total
$ 8,010.71
$ 5,864.18
$ 14,748.01
Net Profit or (loss)
[2,973.49)
$ 2,248.92
$ 3,220.04
Half of net profit reported by petitioner (half
by wife)
Income tax liability disclosed on petitioners
returns
NONE
$ 127.46
$ 411.82
*338 The separate return of Leonard Zwyns for 1944, the original joint returns for 1945 and 1946, and the amended return for 1946 showed the following: 1944
1945
1946
1946
Original
Amended
Total Receipts
$149,531.94
$128,499.45
$123,106.39
$149,835.30
Cost of Goods Sold
Inventory at beginning of year
$ 14,517.11
Merchandise bought for sale
$126,929.96
$111,769.68
$113,893.47
102,007.60
Labor
4,977.99
1,200.00
Materials and supplies
Other Costs *
11,650.13
Total
$143,558.08
$112,969.68
$113,893.47
$116,524.71
Less inventory at end of year
5,500.00
Net cost of goods sold
$143,558.08
$112,969.68
$113,893.47
$111,024.71
Gross Profit
$ 5,973.86
$ 15,529.77
$ 9,212.92
$ 38,810.59
Other Business Deduction
Salaries and wages not included as labor
$ 1,500.00
$ 1,967.95
Interest on business indebtedness
6.25
Taxes (State and Federal excise and property
taxes)
$ 1,160.15
$ 629.91
297.09
329.20
Depreciation
1,867.50
1,647.50
2,662.51
Cold Storage charges
2,036.56
1,438.07
2,258.01
Gasoline and oil
1,062.33
Truck repairs, parts and other expense
1,619.73
3,112.86
Insurance on trucks
381.44
627.75
Insurance on garage]
Truck licenses
302.00
Telephone bills
225.59
U.S. Customs import duty (and brokerage
for 1946)
4,263.91
3,030.06
3,722.59
Bridge tolls
20.00
Other expenses
3,300.46
1,914.91
22,513.55
Total
$ 3,027.65
$ 13,879.51
$ 8,180.13
$ 38,810.59
Net Profit (or loss)
$ 2,946.21
$ 1,650.26
$ 1,032.79
NONE
Half of net profit reported by petitioner (half
by wife)
1,473.11
Income tax liability disclosed on petitioners'
returns
$ 188.00
$ 114.00
NONE
NONE
*339 The net worth of the petitioners as of January 1, 1941, and as of December 31 in the years 1941 to 1946, inclusive, was: Assets
Jan. 1, 1941
Dec. 31, 1941
Dec. 31, 1942
Dec. 31, 1943
Cash in Canadian Banks
$ (77.48) *
$ 1.04
$10,190.05
$ 3,509.47
Cash in American Banks
1,267.53
1,013.45
(7,307.76)
12,826.78
Cash on hand
1,800.00
8,210.00
Inventory
2,305.03
8,400.50
6,500.00
Amts. and Notes Receivable
1,885.00
3,284.11
9,600.00
19,636.25
Deferred expenses
Trucks and automobile
3,720.00
9,267.03
4,671.87
3,521.71
Equipment
363.66
Garage
1,950.00
1,850.00
1,750.00
1,650.00
Residence
4,703.12
4,656.24
4,609.36
4,562.48
Steveston Plant
Total Assets
$13,448.17
$22,376.90
$33,714.02
$60,780.35
Liabilities
Notes payable
$ 8,000.00
Amounts payable
$ 3,304.72
Total Liabilities
$ 8,000.00
$ 3,304.72
Net Worth
$13,448.17
$22,376.90
$25,714.02
$57,475.63
*340 Assets
Dec. 31, 1944
Dec. 31, 1945
Dec. 31, 1946
Cash in Canadian Banks
$ 8,938.56
$ 6,959.60
$ 15,870.13
Cash in American Banks
11,046.80
54,365.67
28,458.79
Cash on hand
9,635.00
10,670.00
4,775.00
Inventory
29,175.57
14,517.11
Amts. and Notes Receivable
3,809.00
46,026.90
Deferred expenses
3,872.15
Trucks and automobile
14,708.04
6,359.43
350.00
Equipment
778.33
2,151.43
6,375.56
Garage
1,550.00
1,450.00
2,298.48
Residence
4,515.60
4,468.72
4,421.84
Steveston Plant
13,636.36
Total Assets
$84,156.90
$100,941.96
$126,085.21
Liabilities
Notes payable
Accounts payable
$ 396.80
$ 498.33
$ 4,585.89
Total Liabilities
$ 396.80
$ 498.33
$ 4,585.89
Net Worth
$83,750.10
$100,443.63
$121,499.32
The taxpayers' personal living expenses were $1,500 for 1941. Their net income for 1941 was $10,428.73. The sales, cost of sales, profit, expenses and net income of the taxpayers for the years 1942 to 1946 were as follows: 1942
1943
1944
1945
1946
Gross Sales Receipts
$57,530.86
$196,258.14
$172,133.54
$151,601.47
$149,835.30
Inventory 1-1
2,305.03
8,400.00
6,500.00
29,175.57
14,517.11
Purchases
52,250.23
150,465.63
150,423.57
126,184.20
111,024.71
Inventory 12-31
8,400.50
6,500.00
29,175.57
14,517.11
Cost of goods sold
43,849.73
143,965.63
121,248.00
111,667.09
111,024.71
Gross profit
13,681.13
52,292.51
50,885.54
39,934.38
38,810.59
Expenses
9,322.13
19,710.73
22,659.57
21,720.37
18,201.47
Net profit
4,359.00
32,581.78
28,225.97
18,214.01
20,609.12
Capital gain
222.25
332.78
602.82
Adjusted gross income
28,225.97
18,546.79
21,211.94
Amt. reported by L.Z. in 1944
14,112.99
Standard deduction
500.00
500.00
500.00
Net Income
$ 4,581.25
$ 32,581.78
$ 13,612.99
$ 18,046.79
$ 20,711.94
*341 In January 1946, Zwyns drew $50,000 in cash from the First National Bank of Everett. In June 1946 he withdrew $10,000 and in January 1947, $50,000 from the same bank. In 1947 revenue agents inquired of Zwyns as to the purpose of the withdrawals and asked to see the books and records. The records Zwyns had at that time were not adequate to permit verification of the returns. These records were in Zwyns' handwriting and recorded sales of fish to various customers amounting to several thousand dollars. A meeting was held in October 1947 attended by Zwyns, his attorney his accountant, and the revenue agents. On November 4, 1947, Zwyns deposited $34,000 in cash in the Ferndale bank. As agreed at the meeting Lehn undertook to ascertain Zwyns' income for the taxable years. Lehn procured information from Zwyns' customers and suppliers as to the sales and purchases of fish and prepared a reconstruction of Zwyns' income from that information and the check registers and bank records. Lehn's investigation was made between November 1947 and June 1948. In June 1948 Lehn furnished a report of his investigation and reconstruction of Zwyns' income on the accrual basis for the years 1942 through 1946, *342 and giving his net worth as of January 1, for the years 1941 to 1947. The net income of Zwyns for the taxable years was computed by the revenue agents from the figures in Lehn's report, with minor corrections, and formed the basis of the respondent's determination of deficiencies. Zwyns was indicted for income tax evasion and in November 1950 tried in the District Court of the United States for the Western District of Washington, Southern Division. He was acquitted by a jury. Zwyns paid the deficiencies in tax prior to the criminal trial. After the acquittal he filed claims for refund of the entire amount paid. In 1946 Zwyns purchased a fish egg plant in Steveston, British Columbia. Prior to 1947 he filed no income tax return in Canada. His United States income tax returns for 1941, 1942, and 1943 indicated that they were prepared on the cash basis. The Canadian Foreign Exchange Control Board published a document entitled "Questions Relating to Canadian Foreign Exchange Control Arrangements which are likely to Be of Interest to Non-Residents", revised to October 30, 1939, in which the following was stated: "1. Q. Why has Canada adopted foreign exchange control? "A. (a) *343 To ensure that imports which are essential to Canada's war effort have first call upon the proceeds of goods and services sold abroad by Canadians and that foreign exchange will be available to meet other Canadian commitments abroad. (b) To prevent unnecessary dissipation of the accumulated foreign assets of Canadian residents so that it will be possible to utilize these assets in the national interest in case of real need. (c) Insofar as the pursuit of these objectives limits the possibility of withdrawing capital from Canada, exchange control will also have the effect of preventing unduly depressed security prices in the Canadian market and will enable the government to carry out its war financing in an orderly manner. "Attainment of these objectives will tend to preserve the foreign investor's underlying security through the war emergency by reducing the strains imposed upon the Canadian economy. "4. Q. Does it affect the non-resident who has a balance in another currency with a Canadian bank as at September 15th, 1939? "A. No. A non-resident may use his foreign currency balances as he sees fit. "5. Q. Does it affect the non-resident who has a balance in Canadian dollars *344 wishes to withdraw such an amount. As to the balance of his account over $5,000, see (b) below. (b) A non-resident bank, company or other body or individual may pay or transfer its Canadian dollar balances to another non-resident or to a resident, or may withdraw them in Canadian dollars." The Royal Bank of Canada published a "Resume of Exchange Control Regulations in Canada" under date of January 30, 1947, in which it is stated that exchange control was established in Canada on September 15, 1939. It is further stated as follows: "Special arrangements have been made with certain countries whereby residents of these countries may effect payment for exports from Canada in Canadian dollars. Briefly, the special arrangement countries at present are the sterling area countries, The French Empire, Belgium and The Netherlands and their possessions, Norway and Czechoslovakia. In addition to exporting goods to the special arrangement countries for payment in Canadian dollars at the debit of the account in Canada of a resident of one of these countries, payment may be effected in U.S. dollars or any foreign exchange which is convertible into U.S. dollars. All other countries not in the *345 group of special arrangement countries are regarded as U.S. dollar area countries. Exports to U.S. dollar area countries must be paid for in U.S. dollars or any other foreign currency convertible into U.S. dollars. With a few minor exceptions, all exports require an export license on Form B 13 B, which is a combination customs' export entry form. When signed and stamped by a Collector of Customs and subject to the Foreign Exchange Control Act and regulations, this form is also a license for the export of goods from Canada. There are presently a few items in short supply which require a special permit from the appropriate Governmental Authority before these goods may be shipped. These controlled exports at present include certain agricultural and animal products, textiles, timber, minerals and metal products, chemicals, etc. "Payments or transfers of Canadian dollars by residents to non-residents require permits on Form G. * * *
"Shipments of Canadian currency abroad must be paid for in foreign exchange. "Non-residents may operate Canadian dollar accounts freely without the need for any permits. However, residents of U.S. dollar area countries may not pay or transfer Canadian *346 dollars from their accounts to residents of special arrangement countries without permission from the Board. Special authority is also required by residents of special arrangement countries covering payments or transfers from their Canadian dollar accounts to residents of U.S. dollar area countries. Payments of Canadian dollars by residents of Canada to the accounts of non-residents of course require permits on Form G. Balances of non-residents' Canadian dollar accounts are not convertible into foreign exchange at the official rate and holders desiring conversion must effect the exchange in the unofficial market outside Canada. * * *
"Application may be made to the Board by non-residents doing business with Canada to operate special resident accounts. In the case of non-residents shipping goods to Canada consigned to the order of themselves or their agents, for subsequent distribution to Canadian purchasers, this procedure is necessary as the resident buyers are not in possession of the import license, Form E, to support their applications to make payment to the non-residents. Non-residents engaged in buying goods in Canada for export should consider operating a Special Resident *347 Account when shipping to special arrangement countries. Residents of special arrangement countries may wish to make payment for exports in Canadian dollars and as indicated in the previous Section dealing with Canadian dollar account of non-residents, such form of payment could not be made to a resident of a U.S. dollar area country. Under the above procedure the Board will provide non-residents with foreign exchange for the balance of their Special Resident Accounts after provision has been made for all their Canadian expenses. This procedure is also used where non-residents arrange with a resident to manufacture goods in Canada for local distribution for their account, undertake a contract in Canada, or the selling and placing of advertising in Canada." A part of each of the deficiencies for the taxable years 1943 to 1946, inclusive, was due to frad taxable years 1943 to 1946, inclusive, was due to fraud with intent to evade tax. The respondent correctly determined a penalty under sections 294 (d) (1) (A) and (d) (2) of the Internal Revenue Code for the taxable year 1946. Opinion Since the petitioners concede that income was understated in the returns, *348 although the computation is questioned, the principal issue for decision is whether the joint returns of the petitioners for 1941, 1942, 1943, 1945, and 1946 and the separate return of Leonard Zwyns for 1944 were false and fraudulent with intent to evade tax. The burden of proof of fraud is upon the respondent, section 1112, Internal Revenue Code. The respondent points out that the actual income of the petitioners in the taxable years was over $100,000 but the returns reported only about $8,000 as income. This, says the respondent, is strong evidence of fraud. It is rarely possible to prove fraud by direct evidence of intention. While fraud is never imputed nor presumed nor deemed established by suspicion or doubt as to intentions, L. Glenn Switzer, 20 T.C. 759, June 30, 1953), it may be deduced from the conduct of the tax-payer. Understatements of income alone are not enough, and poor bookkeeping may afford a valid excuse for minor errors in returns, Manos v. Commissioner, ( C.A. 6, 1951) 187 Fed. (2d) 734, but gross understatements of income undoubtedly received, continued year after year, and based upon a patently lame and untenable *349 excuse warrant the imposition of the 50 per cent addition to the tax for fraud. M. Rea Gano, 19 B.T.A. 518. See also Halle v. Commissioner, ( C.A. 2, 1949) 175 Fed. (2d) 500; Charles A. Rogers, 38 B.T.A. 16, affd. (C.A. 6, 1940) 111 Fed. (2d) 987; Arlette Coat Company, 14 T.C. 751. We are concerned with the intentions of Zwyns at the time he made these returns - whether he knew they were false and fradulent and intended to evade tax. The petitioners' joint return for 1941, which was the first United States income tax return they filed, reported a net loss of $2,973.49. Their actual net income amounted to $10,428.73. They had an increase in net worth of $8,928.73, of which about $5,500 represented increase in the investment in trucks and automobiles and $2,300 was an inventory of fish. Taking into consideration Zwyns' ignorance of accounting methods, his lack of education and his inexperience in income tax matters, we cannot say that the respondent has proved that the return for 1941 was deliberately falsified with intent to evade tax. The discrepancies in the return for 1942, where the sales were understated by about *350 $3,000, the gross profit by $5,500, and the net income by only $2,332.33 do not warrant the conclusion that fraud has been proved with reference to that return. These comparatively minor discrepancies could have been the result of ignorance and poor bookkeeping. Also, the facts that Zwyns owed $8,000 on a note, and a substantial part of the income was represented in increased inventory and accounts receivable, which he may not have considered as income items, would account for his overlooking the increase in his resources. We conclude that fraud has not been proved in the returns for 1941 or 1942. We think the proof is adequate, however, to show that the returns for 1943, 1944, 1945, and 1946 were filed with the knowledge that they were false and fraudulent and with the intent to evade tax. The year 1943 was one of enormous increase in Zwyns' business. His sales of nearly $200,000 were over three times the sales of 1941 or 1942. The return omitted about one sixth of his sales, understating sales by about $32,500, gross profit by $34,000, and net income by $29,000, and showed only $3,220.04 as net income. He had $24,000 in cash on hand and in banks at the end of the year and his net *351 worth was more than doubled. With an increase during the year in cash assets alone of nearly $20,000 he deliberately filed a return showing net income of less than $3,300. It is obvious that this was with intent to evade tax. He must have known that a return showing net income of less than $3,300 was false. The separate return of Zwyns for 1944 was even more distorted. Zwyns supplied the figures to Lehn's office which prepared separate returns for Zwyns and his wife. Sales were understated by some $22,000, but gross profit was reported as $5,973.86 instead of the actual amount of $50,885.54. Net profit was reported as $2,946.21, which was divided between the taxpayers on the community property basis. On the same basis the share of each in the actual adjusted gross income was $14,112.99. At the end of 1944 the petitioners had over $30,000 in cash and accounts and notes receivable and over $15,000 invested in trucks and other equipment. Despite his increasing prosperity Zwyns reported little more than one fifth of his income. For the year 1945 a net profit of $1,650.26 was reported while the true net income was $18,046.79. At the end of the year Zwyns had over $70,000 in cash on hand *352 and in banks. For 1946 the petitioners' original return reported net profit of $1,032.79 with no tax due. An amended return prepared by Zwyns' accountant and filed in February 1949 reports gross profit of $38,810.59 and lists deductions which with a net operating loss for 1948 resulted in a net income of zero. The correct net income, before considering the net operating loss, was $20,711.94. Zwyns had $49,000 in cash on hand and in banks at the end of 1946 with liabilities of only $4,600. In the four years 1943 through 1946 the petitioners' net worth had increased by $100,000. Their cash on hand and in banks had increased by $44,000. Yet they reported less than $9,000 in income on their returns. It would be unrealistic to believe that Zwyns was not aware of his prosperity and increase in assets, or of the falsity of the tax returns. Zwyns argues that the understatements of income were the consequence of ignorance, not fraud. He says that he left school at the age of 10 and has had no education since, that he has difficulty in reading and writing the English language, that he was not aware of the increase in his net worth, and that he was led to believe that he was required to take *353 back to Canada the proceeds of fish transported from Canada into the United States and thought the money thus required to be returned to Canada was not income subject to tax in the United States. Zwyns' testimony concerning his activities and earnings is substantially as follows. He first transported fish for Japanese fishermen in British Columbia to the United States on a commission basis. He also bought fish eggs and salmon on his own account for sale in the United States. When Japan entered the war, the Japanese in British Columbia were interned, and Zwyns bought from other fishermen to keep his business going. The business expanded. The Canadian Foreign Exchange Control Board compelled Zwyns to take out a license as a Canadian exporter, and wouldn't permit removal of fish from Canada until they were paid for. Later the Board allowed removal on condition that the money be deposited in Canada before the fish were removed. Zwyns made a report to the Board which was not satisfactory. McFadden, of the Royal Bank of Canada at New Westminster, British Columbia, who was a member of the Board, handled the preparation of Zwyns' subsequent reports to the Board and told Zwyns he could retain *354 from the proceeds enough to pay customs duties and his living expenses but should deposit the rest in Canadian banks. There is no corroboration of Zwyns' statements. There is no testimony from his wife, son, daughter, McFadden, or any other person having knowledge of his actions prior to 1945. In 1945 the man who had kept the earlier records disappeared and Zwyns went to the accountant Lehn's office to have income tax returns for 1944 prepared. He presented adding machine tapes with figures from which the accountant's office prepared separate returns on the community property basis. The accountant did not examine Zwyns' records. Zwyns returned to Lehn's office to have his returns for 1945 and 1946 prepared and these were made as joint returns of Zwyns and his wife. After the revenue agents began an investigation in 1947, Zwyns took his records to Lehn's office. The records were inadequate as a basis for verifying the returns. At a meeting in October 1947 with the agents and with Lehn and Orloff, Zwyns' attorney, Zwyns made the statement that he understood he was required to bring to Canada all the money received for the fish. This excuse appears for the first time at this meeting. *355 The Canadian Foreign Exchange Control Board issued certain information relating to foreign exchange control arrangements of interest to non-residents. This information does not indicate that there existed any such restrictions as Zwyns describes. Zwyns has cited no authority for the requirements he says he understood to exist. It seems obvious that the only requirement that may have existed was for providing sufficient Canadian exchange to cover purchases and that his profits were not required, and could not be required, to be returned to Canada. The excuse is untenable and plainly fabricated. There is no evidence that Zwyns believed this at the time he made the returns, and his conduct in other respects in the matter does not support his veracity. Zwyns' accountant, Lehn, said that the failure of Zwyns to disclose his actual income could not be accounted for on the basis that the money had to go to Canada. Lehn attributed the discrepancies to poor records, and said the costs, also, were understated on the returns. There has been no attempt by Zwyns to point out which of the sales and expenses he considered should be reported on his returns and which should not. Had he reported *356 his true total sales and claimed deductions for the money he thought he was required to transfer to Canada, his action would be consistent with his explanation. But this he did not do. He did not at the time the returns were prepared tell the accountants that he had money which he considered not taxable because he was required to take it to Canada. There are other matters in the record which tend to show that Zwyns' statements are not entirely reliable. At the conference in October 1947 he made the statement that he had net assets of about $9,000. A few days later, according to Lehn's testimony, Zwyns had a large roll of bills from which he paid Lehn a retaining fee of $500, and made the statement that he was carrying $35,000 he had drawn from the Ferndale bank, that he had taken it to Canada to settle his accounts and that he was advised to bring it back. A deposit slip in evidence shows that on November 4, 1947, he deposited $34,000 in cash in the Ferndale bank. At this October 1947 conference Zwyns gave the names of only a few of his customers. The subsequent investigation by Lehn and the revenue agents uncovered a large number of other customers not named by Zwyns. Zwyns said *357 that all the checks he received from his customers were deposited in his bank accounts, except one or two small checks amounting to possibly $600. The audit report of his accountant disclosed 55 checks amounting to more than $9,000 which were not deposited. Zwyns professed ignorance of bank statements and large figures. However, he handled hundreds of checks and transferred many thousands of dollars from one bank to another. He had no difficulty in reading a figure of $126,000 in the accountant's report at the hearing. He knew he could draw $50,000 in cash in January 1946 from one of his bank accounts. In the face of this record we conclude that the respondent has borne the burden of proving that Zwyns filed false and fraudulent returns for 1943, 1944, 1945, and 1946 with intent to evade tax. The understatements of income were too gross to be due to ignorance and the story that the money had to be taken to Canada is not worthy of belief. The case of L. Glenn Switzer, supra, cited by the petitioners, is not applicable to the facts here shown. The deficiencies were determined upon the basis of an audit report prepared by Zwyns' accountant, Lehn, after an investigation *358 of several months, with some minor changes made by the revenue agents on the basis of their own investigation. This audit report included net worth statements as well as annual profit and loss figures. Zwyns complains that the income figures so derived were computed on the accrual basis while his returns were on the cash basis. The report was prepared on the accrual basis at the request of the revenue agents. As the respondent points out, Zwyns sometimes had considerable inventories of fish, and while some of the fish at the end of the year may have been in transit and disposed of within a day or two, he had fish in cold storage on occasion. Since the books were inadequate to show income, the income is to be computed in accordance with such method as in the opinion of the Commissioner does clearly show income. Section 41, Internal Revenue Code. In the exercise of this discretion the respondent made the computation on the accrual basis because inventories were involved. No error has been shown in this determination. The deficiencies are sustained. The addition to the tax for 1946 for failure to file an estimate or for substantial underestimate is not contested *359 and is sustained. While there is a net loss carry-back from 1948 which, it is stipulated, may be carried back to 1946, the 50 per cent addition to the tax for fraud in respect of the 1946 return is to be computed on the deficiency as determined prior to application of the carry-back. P.C. and Ethel Petterson, 19 T.C. 486; Auerbach Shoe Co., 21 T.C. 191, November 6, 1953). Decisions will be entered under Rule 50. Footnotes
*. "Other Costs" for 1944 included the following items which were shown on "Other Business Deductions" for other years: Insurance $1,043.89, Cold Storage $448.81, Gas and Oil $1,269.79, and U.S. Import Duties $8,887.64.↩
*. Overdraft↩